If you will stand and remain standing for 1 minute. Music. If you will stand and remain standing for 30 seconds. Okay, Mr. Klein. Thank you again, Your Honor, and may it please the Court, you know my name, it's David J. Klein, and in this case, I'm proud to represent Ms. Marta Alicia Mejia Alvarenga against the Attorney General of the United States of America. Your Honor, this is a very, very difficult case to talk about. It's an uneducated Honduran woman who was viciously raped by a Honduran gang member known as Rigoberto. She went to the police about Mr. Rigoberto, and in front of her, the police arrested Mr. Rigoberto. She attended two court hearings, but after approaches thereafter from gang members in S13, from Rigoberto's mother and sister, and Rigoberto's two attorneys who attempted to bribe her into dropping the case, her fear of further harm overrode her desire for justice. Is this Honduras or El Salvador? I'm sorry? Is this Honduras or El Salvador? What country is it? I thought it was El Salvador. I probably confused the two of them, Your Honor. It is El Salvador, you're correct. Thank you very much for the correction. Anyway, after her concern for further harm to herself overrode her desire for justice, she refused to attend any more hearings. When the rapist was released, he paid her a visit in person, threatened her before she fled the United States. Now, in Bustamante Liva case, Your Honor, the Attorney General relied upon three cases. You heard about this from Mr. Remnitz. Soaji, Chang, and Abathani. All three of those cases, they weren't relevant at all. They didn't even involve the proper regulation here. So, the Attorney General decided to revise the Attorney General's argument here. And the new argument he makes is that the board is a creature of regulation, not legislation. And so the Attorney General can do what he wants. He can even make regulations that say, doesn't matter how bad the immigration judge is, doesn't matter that he got the facts wrong, doesn't matter that he got the law wrong, we're still going to decide against you. And, says the government, that's okay. Well, you're here to hear it from me, Your Honor. It's not okay. It is not. The Attorney General isn't allowed to violate the Constitution, even when he's making procedural regulations for a single member of the Board of Immigration Appeals. So, what is your pathway? What is your pathway to relief, specifically? How do you see that, if you believe that there's been a procedural injustice that has perhaps arisen to a constitutional level, what is your pathway to relief from us? Okay, my blood is partly up now, Your Honor. So, I mean, part of the thing to do is to send it back, and it's got to go back to some people that are different people than the ones who decided this case. The direction to those people should be, you need to create a system. And I would love to make the system, okay. I don't know that it's really upon me. If I were creating the system, you need to go back, you need to go back to three judges, you need to make sure that the Department of Homeland Security ends up submitting briefs and participating in the appeal like it's supposed to. But do we, as judges on review, have that? We can't run the system. By what authority would we do that? Oh, to... To say, go back and fix the whole system, and we're going to, you know... Do we have that power? I agree. That's why I... So, we don't have... Essentially, it needs to go back. It needs... I think it still needs to go back to different decision makers. On what authority can we send it back? What's the path for victory for you? How do you get... What would allow us to send it back? It goes back... It's the best thing under the regulations that are already there. Three member judges, three board members can actually make decisions, and they make decisions on the law, and they make decisions on the facts. They're not limited by this regulation that says, no matter what you do, you can't end up reversed in this case. So, it should go back primarily to a three-member panel, Your Honor, and they should not be bound by a regulation that says, you can't make any decision that's adverse to the non-citizen, and they should make sure that the opponent in the proceedings, which is the Department of Homeland Security, actually participates, Your Honor. Can I ask for more than that? I would love to. What is the basis that we could give you that? How could we do that? What is it? How? What's... The Constitution. I mean, it's easy if they can't do something that under the Constitution they should be doing. If they don't follow their own regulations about impartiality, about acting as an appellate panel, then you, Your Honor, have the authority to send it back and say, follow the Attorney General's regulations and do it constitutionally. Let me ask this. We have this opinion, and I do not know how to pronounce it. I've never known it. Soajid v. Ashcroft, that we have said that Section 1003.1E is constitutional, does that in any way prohibit us from giving the relief that you seek today? In my opinion, Your Honor, it does not. I don't know how to say it. This is a problem that Mr. Remnitz was raising with the cases and the regulations that weren't relevant. This is a different regulation. These are different cases. This is a different due process argument that's being made here, Your Honor. Do you believe that the Cardoza-Fonseca standard applies here, where this is not establishing a well-founded fear of persecution from the government, but is instead a case where we're dealing with the government's ability to protect against private persecution? Do you believe that Cardoza-Fonseca is still the correct standard? And if so, why? Okay. There are a number of aspects to that, Your Honor. Do I think that Cardoza-Fonseca is the right standard? Of course it is. And by that I'm talking about essentially the 10% standard. If you're going to go back and you've got 10% being killed and it's for a reason under the asylum statute, then yes, Cardoza-Fonseca is still good. And the interesting thing in both these cases, Your Honor, the immigration judges, and it was affirmed by the board, said that all you need is a slight, I've forgotten the other word that's in there, but essentially a slight chance of it being the case. In other words, you just need a slight chance of being persecuted in order to qualify under these cases. Now, what they don't do and what they should do and what they're wrong in doing, and that is I'm talking about the board and the immigration judges, what they are wrong in doing is that they are not applying that slight chance or that 10% chance to the other essential elements of asylum. You have the nexus element on account of race, religion, nationality, particular social group, political opinion. You can read those board decisions all you want. You're not going to find anything in there that says each of those only has to be shown by 10% also or each of those only has to be shown by slight chance. What they use is they use the language of more likely than not, you haven't shown that you are going to be persecuted on account of religion. And that's wrong. That's not right under Cardozo-Fonseca. So the direct answer to your question is yes, Cardozo-Fonseca is still right. Yes, it should be followed and yes, they need to apply it across the asylum statute so it applies to all the essential elements, not just the one. And one way we know that that should be the case is in criminal cases. When the question presented to the Supreme Court is, does every element of a criminal statute need to be proved beyond a reasonable doubt? And the Supreme Court said, yes. It didn't matter if that was the jurisdictional interstate commerce clause provision. You don't have to just show that by preponderance of the evidence. You have to show that beyond a reasonable doubt. Well, the same thing is applicable to the asylum statute. And if you read the asylum statute, well-founded fear on account of, it doesn't seem to suggest you split up the statute, you take out the parts that it's hard for the non-citizen to prove, you make them more likely than not. But everything else where it's already been litigated like persecution, that only needs to be shown by reasonable fear or 10% or a slight chance. You heard something from Mr. Robinson, and I think it's also applicable here, about whether the court has jurisdiction to actually review the refusal to give the two or three-member panel. And of course it does, Your Honor. Of course it does. Number one reason is the idea of no law to apply. That's from the Administrative Procedure Act. The Administrative Procedure Act, begging the government's pardon, isn't applicable. The APA is not applicable to removal proceedings. And I can cite you a Supreme Court case for that. That's Ardestani v. INS, 501 U.S., page 129, 1991. What that means is the whole law that they cite about no law to apply, it's not a relevant provision in analyzing removal proceedings. What else? There really are standards to apply. And that's what the Sixth Circuit ended up saying. There are standards to apply here. So even if the APA applies, guess what? Courts can review it. And how do I know? Because this court is going to be very careful. But this court actually reviewed the refusal to send a case to a three-member panel. If you forgive my pronunciation. To back Waitera v. Wilkinson, 986 Fifth Third, 905, particularly 914 Fifth Circuit, 2021. Let's get back to the merits instead of the procedural issue. So would you address whether the board properly applied the complete helplessness standard when deciding that this particular alien had failed to show that the Salvadorian government was unable or unwilling to protect her from any kind of private persecution? Because it's only a substantial evidence standard. But the problem here is whether that is the standard, complete helplessness, or is it something different? Now, unsurprisingly, I will take the position that the courts have gone in where they shouldn't have gone in. There was no reason for them to reply, to redefine unable, unwilling to mean essentially agree with, or be complete helpless before it. That was something that the courts imposed on it. The attorney general came along. And this is what I don't understand, Your Honor. The attorney general came along and he's defending the court's imposition of that new standard on it. And he's defending it, even though he himself, a matter of day B, ended up vacating that exact same standard. Your initial time has expired and you've saved time for rebuttal. Thank you, Mr. Clark. Mr. Tennyson? Thank you, Your Honor. May it please the Court. May it please the Court. Robert Tennyson for the government. Let me turn first to the merits of this case. The Board found the petitioner ineligible for asylum because the Salvadoran government would not be unable or unwilling to protect Ms. Mejia Alvarenga from harm or protect her from persecution. And that's under the substantial evidence standard? That is under the substantial evidence standard, sir. What are the facts in the record about when she's gone to court and she's getting these people coming after her and saying, quit going to court? Is there anything in the record about her reporting that and then refusing or providing protection, keeping the people away from her? Right. So remember, after she was unfortunately raped, she went to the police. The police arrested the individual. He was prosecuted. He was jailed. Then his first attorney attempted to bribe her. She went to the court. They dismissed him. Second attorney attempted to bribe her. She went to court. They dismissed him. She started receiving threats or, yes, threats. Generalized threats, no specific threats from individuals saying, you know, something will happen. And those came from her mother who also attempted to bribe her. I mean, from the defendant's mother who also attempted to bribe her. But she never reported any of that. That's what the record doesn't reflect, that she reported that and then the government acquiesced in the or did not protect her against the threats. Right, exactly. There is no indication that she went to the police or went to the judge and said that she was being threatened and that they failed to do anything. Rather, she just stepped back on her own and ceased assisting the prosecution of the case. And, in fact, her case was prosecuted a little bit after she dropped out, before they had to drop the case against him. On those facts, even if the record has copious evidence of impunity in the government and even if when she returned to, you know, mention the police, the anonymous threat that may have been directed to her, that was overruled, right? That a reasonable fact finder would not be compelled to conclude that the government was not, or that the government was unable and unwilling to help her. You know, an immigration judge could have gone the other way. An immigration judge could have looked at the record and said, things are really terrible in El Salvador, you know, with regard to impunity and all of this. And, yes, she didn't report it, you know, and even though the police helped her out in this circumstance, they didn't do it here, a reasonable fact finder can come to a different conclusion. But a reasonable fact finder, given these facts in this case, could readily have come to the conclusion that the fact finder came to here based upon the fact that the government, when she did, come to them with a case of rape, act and jailed them and prosecuted them. Moving next to petitioner's concerns about the standard applied in this case. In Jaco and Bertrand, this court has said that the standard that is being applied, in fact, before that, this court has said that the standard, the complete helplessness standard of unable and unwilling, you know, has long been a standard in this circuit. It's not going to change. And so to go back in AB3 and go back to whatever the law was before that, ARCG and all that, this court had interpreted that and interpreted the unable and unwilling standard to be complete helplessness. So unless and until the Attorney General issues a regulation that may depart from that, that is the standard in this circuit. That is the standard that should be applied. That is how it has been interpreted before AB1 ends. The Attorney General did issue a standard at some point, and we continued with our – the Attorney General did issue a standard at some point, and we continued with our approach and said it wasn't the right approach, you know, in the ARCG, in all of that ARCG stuff. Go ahead. I'm sorry. Right, right. So I think in ARCG, right, you've got – but that's with regard to the particular social group aspect. And, you know, that's not an issue at all in this case, so we don't have to deal with that. Also, next, on the question of the 10% standard, right, the Codoza-Fonseca standard, I'm not sure exactly what Petitioner's counsel was asking for here. I think I'm confused by it. On the one hand, I thought, you know, that maybe he was asking that the immigration judge had to use the magic words 10%, and that can't be right. There are various formulations, and this court uses in its own decisions different formulations for that standard. But it seems to me that what he's saying now is you apply the 10% to each element of the asylum claim, of your claim of persecution. So, for example, is there a 10% chance that you would be persecuted? Is there a 10% chance that it would be on, you know, that it would be due to members of a particular social group? Is there a 10% chance that the government would be unable or unwilling to protect you? But that's not the standard. I mean, if you apply that across the board, Matt says that that reasonable fear standard, that reasonable possibility, suddenly becomes a minute, tiny possibility, right, because you've got a 10% chance of one thing occurring, and then that's multiplied times another 10% chance of the next thing occurring, and then a 10% chance of the government being willing and able. Suddenly you're down to a 1 in 1,000 chance, and that's clearly not the standard that we're looking for. So however you parse what the petitioner wants with regard to the Contoso-Fonseca standard, you don't really get anywhere. Does the court have any further questions about the merits before I turn to the other procedural argument? No? Okay. So at bottom, I mean, the petitioner, I think the challenge to the regulations is precluded in this circuit, as you've said, as you've indicated previously by this court's earlier decision in Solji, I believe. How do you say it? I can't remember how to say it for the life of me. I remember it starts with an S, and I remember it affirms a Second Circuit decision as well, but suddenly it's just this big gap in my mind. But this court has already decided that issue with regard to the streamlining regulations. The second question is, as applied to the petitioner, is there some violation of due process in the application of this? Well, honestly, if the petitioner doesn't prevail, if the petitioner, if the board got it right, one member panel got it right, there's not really any prejudice here. So I don't know how we get to that point at all in whatever the board has said. Do we have to determine whether or not each individual provision of 1003.1E6 is enough guidance to create a judicially meaningful standard under which we can review the claim? Do we have to determine that to decide this case? This court doesn't have to determine that because it's already determined that in Canto de Galicia. So that's not for this court to determine. The court already said that that's discretionary. There's no reason to second-guess that at all. Whether that applies to jurisdiction, that's a different question to the jurisdictional issue. It's a different question because in those cases, in Canto and the subsequent case, both of those involved criminal alien, the criminal alien bar. So the question is whether under Hector Benchigny there is a discernible standard, right? And if it's purely up to the discretion, if it is a, you know, if the single member panel may simply is, if the may has read as this court seems to read it, may transfer it to a three-judge panel, then based upon, you know, whether the board member believes that reversal is potentially in order or must be in order, right? It can be broad. Because it's discretionary. It's completely discretionary. So there's no meaningful standard. The court can't review it. If this court has no further questions. All right. Thank you, Mr. Tenton. Thank you very much. Mr. Kline for rebuttal. Thank you, Your Honors. There is one thing I want to say about there being no report. There actually was a report in the case. Now exactly where it appeared in the case I don't recall. But what happened was one of the relatives, Ms. Mejia Alvarenga, found a paper, a threat nearby the house. She took that to the police. And the police said to her, huh, so what? There's no blood. There's no broken bones. What do you expect us to do anything about it? We can't do anything about it. They're paraphrasing, of course, what I put in. But that's essentially what they said to her. And, of course, she didn't take non-blood, non-broken bones, non-written threats to the police after that because the police weren't doing anything. So we can't say that this is a case where the police did everything it could possibly do. In fact, when it was presented with a written threat, it threw up its hands and it shrugged. And I do want to talk a little bit about Brand X and the impact on this case. Brand X, of course, says that when a court makes a decision and then the administrative body makes a decision and the administrative body uses its authority under Chevron to interpret, it's the end decision of the agency, not the prior decision of the board that ends up being the predominant factor. And in this case, that's exactly—well, that is what you have. I will retract the word exactly. That is what you have in this case. What you had is the court said one thing about complete helplessness. The attorney general came along and said, I have the authority to interpret this. I think he did. And now we're back to the court. And in such a situation under Brand X, it says—and I'm begging your pardon, Your Honor, but it says that the administrative agency here, the vacuum of matter of AB, complete helplessness standard, is the one that the court has to follow. And I, for the life of me, don't understand why the attorney general isn't here making that argument. It's the attorney general's argument in favor of the attorney general's interpretation. And I'm the one that's making it. And the government, the attorney general, is making it otherwise. And then, just as in the other case, Ms. Mejia-Alvarenga has petitioned for a rulemaking on this particular issue. And given that the attorney general himself said a matter of AB, I will do a rulemaking. One would suppose that might give a little extra credit to Ms. Mejia-Alvarenga's petition for rulemaking. And that is why the government, I believe, did not oppose staying in the case until the new regulation came out. I thank you all. If I got a little excited, I apologize. But thank you very, very much for listening. All right. Thank you, Mr. Kline. Your case is under submission.